STATE OF LOUISIANA ex rel. William J. GUSTE, Jr., Attorney General, Plaintiff–Appellant,

and

Cashco Oil Co., et al., Intervenors–Appellants,

v.

UNITED STATES of America, et al., Defendants–Appellees.

No. 87–4106.

United States Court of Appeals, Fifth Circuit.

Nov. 25, 1987.
Rehearing and Rehearing En Banc Denied Dec. 23, 1987.

---

George W. Hardy, III, Mangham, Hardy, Rolfs, Bailey & Abadie, Lafayette, La., for Cashco Oil Co.

L. Todd Gremillion, Sheila R. Tweed, Dotson, Babcock & Scofield, Houston, Tex., for Seneca Resources Corp.

B.J. Duplantis, Gordon, Arata, McCollam, Stuart & Duplantis, Lafayette, La., for Pelto Oil Co.

William J. Guste, Jr., Atty. Gen., Gary L. Keyser, Asst. Atty. Gen., Mary Ellen Leeper, Baton Rouge, La., for State of La.

D.H. Perkins, Jr., U.S. Atty., Lafayette, La., for USA & Director of the Mineral Mgmt. Serv.

Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lawrence E. Donohoe, Jr., Randall C. Songy, Patrick G. Tracy, Jr., Lafayette, La., for Samedan Oil Corp.

Charles W. Findlay, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Robert L. Klarquist, Appellate Section, Jacques B. Gelin, Lawrence W. Moon, Asst. U.S. Atty., Lafayette, La., for Secretary of Interior.

Before REAVLEY, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

REAVLEY, Circuit Judge:

Louisiana sued the United States and a federal lessee operating on the Outer Continental Shelf for violations of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.* (1986), and an alleged policy agreement between Louisiana and the United States. The district court entered summary judgment for the United States and its lessee, 656 F.Supp. 1310. We affirm.

Pursuant to a federal lease, the Samedan Oil Corporation ("Samedan") conducts an offshore drilling operation on federal Outer Continental Shelf ("OCS") territory which borders the Louisiana offshore boundary. The leased federal tract is adjacent to state tracts leased by the Cashco Oil Company, the Seneca Resources Corporation and the Pelto Oil Company (collectively referred to as the "state lessees").

The State of Louisiana sued the United States, the Secretary of the Interior (the "Secretary"), the Director of the Minerals Management Service ("MMS") (collectively referred to as the "federal defendants") and Samedan seeking declaratory and injunctive relief in connection with Samedan's "imprudent and wasteful spacing, drilling, completion, and production practices" on its federal lease. Louisiana asserted that a common reservoir of natural gas underlay the federal/Louisiana border with 84% of the reserves located on Louisiana territory and 16% on the federal domain and that Samedan was draining state reserves and engaging in wasteful practices with the permission of the federal defendants.

The state raised three causes of action. First, it alleged that the federal defendants have a duty under 43 U.S.C. § 1337(g) (1986) to enter into a unitization agreement[1] with the Governor of Louisiana and sought a temporary restraining order and preliminary and permanent injunctions limiting Samedan's production. It also sought preliminary and permanent injunctions directing the Secretary to engage in negotiations to achieve unitization with respect to Samedan's lease and a declaratory judgment holding that the Secretary's refusal to unitize violates § 1337(g).

Second, it alleged that the MMS is in violation of a 1975 policy agreement between Louisiana and the MMS and that the MMS is permitting Samedan to operate in violation of this agreement. Louisiana sought the same relief requested in its first cause of action with the exception of the desired declaratory judgment, which differed in that it sought a holding that the MMS was in violation of the policy agreement.

Louisiana's third contention was that Samedan is violating Louisiana's correlative rights by engaging in wasteful production practices and that the federal defendants are in violation of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, by permitting these practices. It sought a temporary restraining order and preliminary and permanent injunctions limiting Samedan's production to prevent waste.

The district court granted the state lessees' motion to intervene as plaintiffs and the state lessees adopted the causes of action and relief sought by Louisiana. The court denied Louisiana's motion for a preliminary injunction limiting Samedan's production. The federal defendants and Samedan separately moved for summary judgment and the federal defendants moved to

---

1. Mineral Management Service's regulations define the terms "unit agreement" and "unitization." 30 C.F.R. 250.2(hhh) (1986) states:

   "Unit agreement" means an agreement providing for the exploration for and development and production of minerals from OCS submerged lands as a single consolidated entity without regard to separate ownerships and

for the allocation of costs and benefits on a basis defined in the agreement.

30 C.F.R. 250.2(jjj) (1986) states:

   "Unitization" means the combining or consolidation of separately owned lease interests for the joint exploration or development of a reservoir or potential hydrocarbon accumulation under the terms of a unit agreement.

dismiss the section 1337(g) unitization claim under Fed.R.Civ.P. 12(b)(2). The court granted the motions for summary judgment as to all three causes of action and, after relabeling the 12(b)(2) motion to a motion under 12(b)(6), granted that motion as well.[2] This appeal is taken by Louisiana and the state lessees.

We hold that the Secretary has no duty to unitize under section 1337(g)(3) as amended, that the alleged policy agreement did not create legally enforceable rights and that no evidence is presented that Samedan engaged in wasteful practices. We therefore affirm the judgment below.

## I. Unitization Under Section 1337(g) as Amended in 1986

■ Louisiana contends that section 8(g) of the OCSLA, 43 U.S.C. § 1337(g), as amended in 1986, requires the Secretary to engage in good faith negotiations with the Governor of Louisiana to achieve unitization of the federal and state tracts upon which Samedan and the state lessees operate. A brief review of the history of section 8(g) is in order.

**2.** We do not address the district court's reasoning in granting the relabeled 12(b)(6) motion because we fully affirm the summary judgment.

**3.** The author of the Preamble to the unitization regulations, 30 C.F.R. § 250.50, stated that "[a] lease does not grant lessees the ownership of minerals in place, and the Law of Capture applies to the development and production of OCS minerals." 45 Fed.Reg. 29,281, May 2, 1980.

**4.** 43 U.S.C. § 1337(g) (1978) specified that:
**(g) Leasing of lands within three miles of seaward boundaries of coastal States**
(1) At the time of soliciting nominations for the leasing of lands within three miles of the seaward boundary of any coastal State, the Secretary shall provide the Governor of such State—
(A) an identification and schedule of the areas and regions proposed to be offered for leasing;
(B) all information concerning the geographical, geological, and ecological characteristics of such regions;
(C) an estimate of the oil and gas reserves in the areas proposed for leasing; and
(D) an identification of any field, geological structure, or trap located within three miles of the seaward boundary of such coastal State.

In 1953, the Submerged Land Act, 43 U.S.C. § 1301 *et seq.*, was passed giving coastal states the right and power to manage submerged lands adjoining their respective coasts. For most coastal states, including Louisiana, the grant extends seaward for three miles. The enactment of the OCSLA in 1953, 43 U.S.C. § 1331 *et seq.*, authorized the Secretary of the Interior to issue oil, gas and other mineral leases for the submerged lands of the continental shelf, which begins where the states' jurisdiction ends.

While these statutes established jurisdictional boundaries, they did not address the issue of drainage. Because oil and gas reserves can straddle the jurisdictional boundary, it is possible for the lessee of one government to drain the reserves located on the other government's territory. Under the common law rule of capture, which we apply to the OCS,[3] the owner of land has the right to capture oil and gas underlying his property, including that which migrates to his property from another's land.

In 1978, Congress amended the OCSLA, adding a new section 8(g), 43 U.S.C. 1337(g),[4] which specifically addressed the

(2) After receipt of nominations for any area of the outer Continental Shelf within three miles of the seaward boundary of any coastal State, the Secretary shall inform the Governor of such coastal State of any such area which the Secretary believes should be given further consideration for leasing. The Secretary, in consultation with the Governor of the coastal State, shall then, determine whether any such area may contain one or more oil or gas pools or fields underlying both the outer Continental Shelf and lands subject to the jurisdiction of such State. If, with respect to such area, the Secretary selects a tract or tracts which may contain one or more oil or gas pools or fields underlying both the outer Continental Shelf and lands subject to the jurisdiction of such State, the Secretary shall offer the Governor of such coastal State the opportunity to enter into an agreement concerning the disposition of revenues which may be generated by a Federal lease within such area in order to permit their fair and equitable division between the State and Federal Government.
(3) Within ninety days after the offer by the Secretary pursuant to paragraph (2) of this subsection, the Governor shall elect whether to enter into such agreement and shall notify the Secretary of his decision. If the Governor accepts the offer, the terms of any lease issued

administration of federal OCS lands situated between three and six miles offshore (the "8(g) zone"). Section 8(g) essentially established a scheme whereby revenues obtained by a federal lessee operating in the 8(g) zone would be shared in a fair and equitable manner by the federal government and the coastal state if a determination was made that a common field of oil or gas underlay federal and state territory so as to create a threat of drainage by the federal lessee.[5]

Section 8(g)(1) required that the Secretary provide certain information to the Governor of the affected coastal state at the time that nominations were solicited for the leasing of lands in the 8(g) zone. Section 8(g)(2) provided that the Secretary inform the Governor of potential areas to be leased and that they consult to determine whether these areas may contain common fields of oil or gas. If an area potentially containing a common field was selected for development, the Secretary was required to offer the Governor the opportunity to enter an agreement concerning the disposition of revenues generated by the federal lessee to permit a fair and equitable division.

Under 8(g)(3) of the 1978 Act, the Governor had 90 days to determine whether to accept the agreement. If the Governor decided to decline the agreement, the Secretary could proceed with the leasing of the area, and under 8(g)(4), the Secretary was required to deposit bonuses, royalties and other revenues attributable to the lease in a separate treasury account until an agreement was reached or a United States District Court determined a fair and equitable disposition of the revenues.

That plan did not work. The Secretary and the governors of coastal states failed to reach agreement, resulting in a balance of $6.1 billion in special treasury accounts by 1986. H.R.Rep. No. 300, 99th Cong., 2d Sess. 547 (1985), *reprinted in* 1986 U.S. Code Cong. & Admin.News at 1058. Litigation ensued over the proper allocation of these revenues, but none of these actions were ultimately resolved by the courts.[6] The two sides also failed to agree on the interpretation of § 8(g); the Secretary maintained that the sole purpose of § 8(g) was to compensate for drainage, and the states contended that § 8(g) not only included drainage but also compensation for onshore impacts of OCS development. *See State of Texas v. Secretary of the Interior*, 580 F.Supp. 1197, 1222 (E.D.Tex.1984).

In 1986, Congress amended the OCSLA to obviate the litigation and disputes and to distribute the impounded revenues in the special Treasury accounts. Comprehensive

---

shall be consistent with the provisions of this subchapter, with applicable regulations, and, to the maximum extent practicable, with the applicable laws of the coastal State. If the Governor declines the offer, or if the parties cannot agree to terms concerning the disposition of revenues from such lease (by the time the Secretary determines to offer the area for lease), the Secretary may nevertheless proceed with the leasing of the area.

(4) Notwithstanding any other provision of this subchapter, the Secretary shall deposit in a separate account in the Treasury of the United States all bonuses, royalties, and other revenues attributable to oil and gas pools underlying both the outer Continental Shelf and submerged lands subject to the jurisdiction of any coastal State until such time as the Secretary and the Governor of such coastal State agree on, or if the Secretary and the Governor of such coastal State cannot agree, as a district court of the United States determines, the fair and equitable disposition of such revenues and any interest which has accrued and the proper rate of payments to be deposited in

the treasuries of the Federal Government and such coastal State.

5. The legislative history to the 1978 amendments reveals that Section 8(g) was

intended to establish a procedure for the orderly and efficient leasing and development of Federal Outer Continental Shelf lands contiguous with state tidelands. While the issue of jurisdiction over offshore lands has been resolved by the U.S. Supreme Court in *United States v. Maine*, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975), the problem of drainage of state resources by a lessee operating on the Outer Continental Shelf has not been so resolved.

H.R.Rep. No. 590, 95th Cong., 1st Sess. 144 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News at 1550.

6. *State of Louisiana v. Watt*, 631 F.Supp. 648 (E.D.La.1985), 5th Cir. No. 85–3140; *State of Texas v. Secretary of the Interior*, 5th Cir. No. 84–2422; *State of Alaska v. United States*, C.A. A–85–502 (D.Ark.), dismissed by stipulation on July 31, 1986.

Omnibus Budget Reconciliation Act of 1985 (Outer Continental Shelf Lands Act Amendments of 1985), Pub.L.No. 99–272, 100 Stat. 82, 147–51 (1986) ("1986 Amendments"). Louisiana received $572 million on October 1, 1986, together with 27 percent of deposited federal royalties derived from OCS lessees through September 30, 1985 with interest, and $84 million to be paid over a fifteen year period. 1986 Amendments § 8004(b)(1). The acceptance of a payment under this section satisfied and released all state claims against the United States arising under the 1978 version of section 8(g).[7]

The 1986 amendments comprehensively revised section 8(g). The provisions[8] that required the Secretary to offer the Governor of an affected coastal state an opportunity to enter an agreement concerning the disposition of revenues generated from federal lessees, and to deposit these revenues in a separate Treasury account if no agreement was reached pending a fair and equitable disposition by court adjudication, were abolished. New section 8(g)(2) provides that 27 percent of "all bonuses, rents, and royalties, and all other revenues ... derived from any lease issued after September 18, 1978" on federal land in the 8(g) zone be transmitted to the coastal state adjoining the federal land.[9] The coastal state receives this 27 percent regardless of whether federal lessees are draining resources from state territory. The remaining 73 percent is transmitted to the United States Treasury. Section 1332, which contains a congressional declaration of policy, was revised to include a new part (4)(B) (the old part (4)(B) was renumbered (4)(C)) which provides that the 27 percent received by states under new section 8(g)(2), "will provide affected coastal states and localities with funds which may be used for the mitigation of adverse economic and environmental effects related to the development of [OCS] resources."[10]

Section 8(g)(3)[11], which is the focus of this litigation, was amended to provide that

7. Section 8004(b)(2) provides:

The acceptance of any payment by a State under this section shall satisfy and release any and all claims of such State against the United States arising under, or related to, section 8(g) of the Outer Continental Shelf Lands Act, as it was in effect prior to the date of enactment of this Act and shall vest in such State the right to receive payments as set forth in this section.

8. 43 U.S.C. § 1337(g)(2)–(4) (1978).

9. 43 U.S.C. § 1337(g)(2) (1986) provides that: (2) Notwithstanding any other provision of this subchapter, the Secretary shall deposit into a separate account in the Treasury of the United States all bonuses, rents, and royalties, and other revenues (derived from any bidding system authorized under subsection (a)(1) of this section), excluding Federal income and windfall profits taxes, and derived from any lease issued after September 18, 1978 of any Federal tract which lies wholly (or, in the case of Alaska, partially until seven years from the date of settlement of any boundary dispute that is the subject of an agreement under section 1336 of this title entered into prior to January 1, 1986 or until April 15, 1993 with respect to any other tract) within three nautical miles of the seaward boundary of any coastal State, or, (except as provided above for Alaska) in the case where a Federal tract lies partially within three nautical miles of the seaward boundary, a percentage of bonuses, rents, royalties, and other revenues (derived from any bidding system authorized under subsection (a)(1) of this section), excluding Federal income and windfall profits taxes, and derived from any lease issued after September 18, 1978 of such tract equal to the percentage of surface acreage of the tract that lies within such three nautical miles. Except as provided in paragraph (5) of this subsection, not later than the last business day of the month following the month in which those revenues are deposited in the Treasury, the Secretary shall transmit to such coastal State 27 percent of those revenues, together with all accrued interest thereon. The remaining balance of such revenues shall be transmitted simultaneously to the miscellaneous receipts account of the Treasury of the United States.

10. The full text of amended § 1332(4)(B) reads:

(B) the distribution of a portion of the receipts from the leasing of mineral resources of the outer Continental Shelf adjacent to State lands, as provided under section 1337(g) of this title, will provide affected coastal States and localities with funds which may be used for the mitigation of adverse economic and environmental effects related to the development of such resources.

11. 43 U.S.C. § 1337(g)(3) (1986) provides:

(3) Whenever the Secretary or the Governor of a coastal State determines that a common potentially hydrocarbon-bearing area may underlie the Federal and State boundary, the Secretary or the Governor shall notify the

the Secretary or the Governor of a coastal state *shall* notify the other if either determines that a common potentially hydrocarbon-bearing area may underlie the federal and state boundary and that the Secretary *shall* provide to the Governor notice of current and projected development in the area. Additionally, if the Secretary has, or intends to, lease the area, the Secretary and the Governor *may* enter into a unitization or other royalty sharing agreement, pursuant to existing law, to share the revenues from production. If no agreement is reached, the Secretary may proceed with the leasing of the area. If an agreement is reached, the revenue received by the federal government is subject to the 27–73 percent division set forth in section 8(g)(2). The wording of this new section does not require the Secretary to unitize or enter into a royalty sharing agreement with the Governor of an affected state.

Louisiana, however, contends that the amended statute compels the Secretary to enter into a unitization or other royalty sharing agreement. Louisiana argues that the word "may" in the phrase, "the Secretary and the Governor of the coastal State *may* enter into an agreement to divide the revenues from production of any common potentially hydrocarbon-bearing area, by unitization or other royalty sharing agreement, pursuant to existing law" (emphasis added), should be read to *require* the Secretary to negotiate either a unitization or other royalty sharing agreement. Louisiana views the permissive nature of the word "may" to permit the Secretary to choose the form of agreement but not to allow the Secretary to refuse to enter any agreement.

To reach this conclusion, Louisiana first argues that revenues derived from section 8(g)(2) do not compensate coastal states for drainage but only for onshore economic

and environmental damage, and for the costs of development to the state's infrastructure, such as roads and schools. Louisiana then argues that section 8(g)(3) is designed to address the drainage issue, and the meaning of this section, construed in the light of its legislative history, requires the Secretary to negotiate in good faith some form of agreement with the Governor of an affected coastal state when the possibility of drainage by a federal lessee exists.

We find no merit to Louisiana's construction of section 8(g). Its interpretation is not supported by the congressional purpose which animated the 1986 amendments or by the plain meaning of section 8(g)(3). We decline to address Louisiana's underlying contention that state revenues derived from section 8(g)(2) do not include drainage compensation because our interpretation of section 8(g)(3) makes resolution of that issue unnecessary. Congress contemplated that the Secretary and the Governors would attempt to allocate royalty or unitize production from common reservoirs, but no statutory consequences are provided in the event of failure—either to agree or attempt to agree. The states are assured of substantial compensation by section 8(g)(2).

The 1986 amendments were intended to permanently settle disputes over OCS revenues. Under the 1978 version of section 8(g), the Secretary and the Governors of coastal states were in constant disagreement concerning the fair and equitable disposition of OCS revenues, resulting in a $6.1 billion balance in special treasury accounts. The 27 percent allocation in the 1986 revision of section 8(g)(2) was designed to prevent future litigation on this issue. Senator Johnston, one of the sponsors, made this objective clear:

[T]he committee legislation settles the entire issue, and *thus avoids the inev-*

---

other party in writing of his determination and the Secretary shall provide to the Governor notice of the current and projected status of the tract or tracts containing the common potentially hydrocarbon-bearing area. If the Secretary has leased or intends to lease such tract or tracts, the Secretary and the Governor of the coastal State may enter into an agreement to divide the revenues from production

of any common potentially hydrocarbon-bearing area, by unitization or other royalty sharing agreement, pursuant to existing law. If the Secretary and the Governor do not enter into an agreement, the Secretary may nevertheless proceed with the leasing of the tract or tracts. Any revenues received by the United States under such an agreement shall be subject to the requirements of paragraph (2).

*itable recurrence of future disputes over future 8(g) revenues....*

\*　　\*　　\*　　\*　　\*　　\*

Although this legislation offers the States considerably less than they sought, we feel it is a fair and equitable resolution. *We believe this legislation will end current and future litigation over the 8(g) issue,* and by giving the States a small stake in revenues from a small area of the OCS, will actually spur OCS development.

131 Cong.Rec. S15,438 (daily ed. Nov. 14, 1985) (emphasis added). This intention was stated by other senators as well.[12]

Congressional desire to eliminate litigation over OCS revenues is clearly reflected by the allocation to the states of 27 percent of all mineral revenues from federal lands, and by the abolition of the provisions requiring the negotiation of revenue sharing agreements and equitable dispositions by court decree of disputed revenues held in treasury escrow accounts. Louisiana's construction of section 8(g)(3) would emasculate this clear congressional policy by engaging the courts in further litigation over revenue sharing and the determination of whether the Secretary has negotiated unitization agreements in good faith.

The plain meaning and legislative history of section 8(g)(3) also do not support Louisiana's contention that the Secretary is compelled to enter a revenue sharing agreement. While the notification requirements of section 8(g)(3) are cast in mandatory language,[13] the revenue sharing provision is clearly permissive.[14] This language invests the Secretary with discretion to enter into agreements but does not require him to do so. The legislative history supports this interpretation.[15]

Samedan's liability on this cause of action is dependent upon a finding of liability against the federal defendants. The district court correctly granted the federal defendants' and Samedan's motions for summary judgment.

## II. The Policy Agreement

■ As its second cause of action, Louisiana asserts that Samedan is violating, with the permission of the MMS, a 1975 policy agreement between the United States Geological Survey, the predecessor agency to the MMS, and the Louisiana State Mineral Board and Office of Conservation. This alleged agreement created a 4,000 foot buffer zone along the federal/state boundary (2,000 feet per side), set well spacing requirements within this

---

12. Senator Heflin noted that:
    This proposal, while certainly not perfect, will finally settle the allocation issue in a fair and equitable way. By adopting the Committee proposal, further litigation can be avoided and a workable framework can be established for the future allocation of 8(g) revenues.
    131 Cong.Rec. S15,438 (daily ed. Nov. 14, 1985). Senator McClure repeated this intention:
    While the committee could have simply allocated the present amount of revenues in the 8(g) account once we had determined exactly how much should be in there, that would not have resolved the litigation. The result would have been that we would have to go through this same procedure again in 3 years. We decided that would not be a responsible recommendation. If the Senate desires that this issue be resolved, then it should be resolved with finality.
    The [Committee] recommendation does just that. It defines the account and provides a clear and unambiguous allocation of future revenues.
    131 Cong.Rec. S15,438–39 (daily ed. Nov. 14, 1985).

13. 43 U.S.C. § 1337(g)(3) reads, in pertinent part:
    Whenever the Secretary ... determines that [a common reservoir] may underlie the Federal and State boundary, the Secretary ... *shall* notify the other party ... and the Secretary *shall* provide ... notice of the ... status of the tract.... [emphasis added]

14. If the Secretary has leased or intends to lease such tract ... the Secretary ... *may* enter into an agreement to divide [production revenues] by unitization or other royalty sharing agreement, pursuant to existing law.
    *Id.* (emphasis added).

15. *See* 131 Cong.Rec. S15,425 (daily ed. Nov. 14, 1985) (remarks of Senator Johnston). During the development of new section 8(g)(3) the House Interior and Insular Affairs Committee received a proposal from the state of Alaska which would have expressly enabled states to compel the Secretary to unitize common reservoirs. No Representative or Senator offered this draft as a bill or amendment to a bill.

zone, provided for the exchange of drilling permits for wells authorized within the zone and provided that the party with the largest share of any unit formed within the zone would have the right to set the unit production rates. Louisiana asserts that this last provision implicitly incorporates a duty on behalf of the Secretary to negotiate unitization agreements in good faith.

Louisiana's claim is groundless. The alleged agreement is evidenced by internal memoranda, labeled "tentative" and "unofficial," generated by both parties and by a history of regulation consistent with the terms of this alleged agreement. The district court correctly found that the documents do not create legally enforceable rights either against the federal defendants, because they were never officially adopted, or against Samedan, because they were not published pursuant to the Administrative Procedure Act, 5 U.S.C. § 552(a)(1)(D) (1977).[16] We affirm the summary judgment against Louisiana's claim on the policy agreement.

### III.  The Correlative Rights Claim

Louisiana contends that Samedan's well spacing and production practices constitute waste and that this activity, along with Samedan's drainage of state resources, violates Louisiana's correlative rights. The state bases its correlative rights claim against Samedan on Louisiana and federal law. Under the OCSLA, Louisiana asserts, the Secretary has a duty to protect correlative rights threatened by its lessees and to

unitize federal and state tracts where a violation exists.

■ Federal law determines our disposition of this issue, rendering the state's claim under Louisiana law groundless. 43 U.S.C. § 1333(a)(1)(2); *see Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 356–57, 89 S.Ct. 1835, 1837–38, 23 L.Ed.2d 360 (1969). Section 1334(a) of the OCSLA provides that the Secretary shall prescribe certain rules and regulations and that

> [t]he Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein....

Correlative rights "means the right of each lessee to be afforded an equal opportunity to explore for, develop, and produce, without waste, oil or gas, or both, from a common source." 30 C.F.R. 250.2(i) (1986). The definition of correlative rights excludes claims for drainage losses and is consistent with the rule of capture. Therefore, Louisiana's third cause of action is limited to an assertion that Samedan is committing waste which the federal defendants have an obligation to prevent through unitization.

■ The Director of the MMS is authorized to administer the rules and regulations promulgated by the Secretary. 30 C.F.R. 250.1 (1986). The Director has a duty to prevent waste of natural resources by federal lessees. 30 C.F.R. 250.11(a)(1) (1986).[17] This duty does not require the

---

**16.** This section specifies that:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

\* \* \* \* \* \*

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretation of general applicability formulated and adopted by the agency; and

\* \* \* \* \* \*

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.

**17.** This rule provides:

(a) The Director, in accordance with the regulations in this part, shall:

(1) Regulate all operations conducted under a lease or permit and shall issue and amend OCS Orders and other orders and field rules as may be necessary and proper in order to supervise operations and to prevent harm or damage to, or waste of, any natural resource (including any mineral deposits in areas leased or not leased), any life (including fish and other aquatic life), property, or the marine, coastal, or human environment.

Director to unitize to prevent waste;[18] the unitization regulations are cast in permissive language. 30 C.F.R. 250.51-1, 2 (1986). Other means of preventing waste are available.[19]

The regulations define waste as:

(1) The physical waste of oil and gas; (2) the inefficient, excessive, or improper use of, or the unnecessary dissipation of, reservoir energy; (3) the locating, spacing, drilling, equipping, operating, or producing of any oil or gas well or wells in a manner which causes or tends to cause reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations or which causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas; and (4) the inefficient storage of oil.

30 C.F.R. 250.2(qq) (1986). Louisiana contends that Samedan's well spacing and production practices tend to cause reduction in the quantity of gas ultimately recoverable.

█ Assuming that Louisiana or the state lessees would have a cause of action against the Director or Samedan because of waste, this record raises no issue to support such a claim. The closest Louisiana got to this issue was expert testimony given during the hearing on the state's motion for a preliminary injunction that coordinated exploration might enhance the amount of hydrocarbons ultimately recovered. Against that suggestion was detailed proof by Samedan of prudent operations in accord with federal regulations and under substantial oversight by the MMS. We find no evidence of waste in the record and affirm the summary judgment.

The district court's judgment is AFFIRMED.

---

**18.** The author of the Preamble to the unitization regulations stated that "(g)enerally, unitization will not be authorized solely to protect correlative rights." 45 Fed.Reg. 29,281 (May 2, 1980).

**19.** See, for example, 30 C.F.R. 250.17 (1986), which authorizes the Director to approve well spacing to protect correlative rights.