United States Court of Appeals,

Eleventh Circuit.

No. 94-6657.

STATE OF ALABAMA, State of Alabama ex rel. James H. Evans, Attorney General, Plaintiffs-Appellants-Cross-Appellees,

v.

UNITED STATES DEPARTMENT OF the INTERIOR, Minerals Management Service, Defendants-Appellees-Cross-Appellants,

Manuel Lujan, Jr., Scott Sewell, Defendants,

OXY USA Inc., Defendant-Intervenor-Appellee-Cross-Appellant,

Exploration Mobil Oil Exploration & Producing Southeast, Inc., Conoco, Inc., Texaco Exploration and Production, Inc., Intervenors-Appellees-Cross-Appellants,

AGIP Petroleum Company, Inc., Intervenor.

June 5, 1996.

Appeals from the United States District Court for the Southern District of Alabama. (No. CV 91-0850 BH, William Brevard Hand, Judge.

Before COX and BARKETT, Circuit Judges, and PROPST[*], District Judge.

BARKETT, Circuit Judge:

Both parties appeal different aspects of the summary disposition of this cause. The material facts are not in dispute. Under a lease agreement with the U.S. Department of the Interior ("DOI"), Mobil Oil Exploration and Production Southeast, Inc. presently leases a tract of submerged land on the outer continental shelf called Federal Offshore Lease Block 823. On this tract, Mobil has four wells producing natural gas from a reservoir that straddles the federal/Alabama border. Mobil pays royalties to the

[*]Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

DOI on the natural gas it produces.  Though the natural gas reservoir lies partially within Alabama, Mobil pays no royalties to Alabama.

Under federal law, the DOI and an adjoining coastal state may agree to share the royalties derived from reservoirs that straddle the federal/state boundary.  Federal law also requires the DOI to give the state 27% of the royalties it receives from reservoirs near the state border as compensation for drainage from reservoirs lying partly within the state.[1]  Alabama and the DOI negotiated in an effort to reach an agreement on the sharing of royalties from reservoirs along the federal/Alabama border.  When they could not reach an agreement, Alabama sued the DOI seeking a declaration that, before the DOI may authorize Mobil to produce natural gas on Block 823 from the particular reservoir straddling the federal/Alabama boundary, federal law required the DOI first to enter into a formal cooperative development agreement with Alabama that addressed compensating Alabama for any drainage that may occur from that reservoir.

Alabama premises its claim upon section 5(j)(2) of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1334(j)(2), which provides as follows:

> (j) Cooperative development of common hydrocarbon-bearing areas
>
> (2) Prevention of harmful effects
>
> The Secretary shall prevent, through the cooperative development of an area, the harmful effects of unrestrained competitive production of hydrocarbons from a common

---

[1] *See* Section 8(g) of the OCSLA, 43 U.S.C. § 1337(g), discussed *infra.*

hydrocarbon-bearing area underlying the Federal and State boundary.

43 U.S.C. § 1334(j)(2).[2]

## I. Background

Coastal states own submerged lands adjoining their coasts extending seaward three miles. *See* Submerged Land Act of 1953, 43 U.S.C. § 1312; *see also* Roger J. Marzulla, *Federalism Implications and OCSLA Section 8(g),* 2 Nat. Resources & Env't 26, 26-27 (1986). The Secretary of the DOI has the authority to issue oil, gas and other mineral leases for the submerged lands of the outer continental shelf, which Congress has defined as beginning where the states' jurisdiction ends, i.e., more than three miles from the coast. *See* OCSLA, 43 U.S.C. § 1331 *et seq.*

Though the Submerged Land Act of 1953 and the OCSLA establish jurisdictional boundaries, they do not address the issue of oil and gas drainage. Because oil and gas reserves can straddle the jurisdictional boundary, it is possible for the lessee of one government to drain the reserves located under the other government's territory. Under the common law "rule of capture," the owner of land has the right to capture all oil and gas underlying his land including oil and gas that migrates there from beneath another's land. *See* 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law 983 (1995); *State of Louisiana v. United*

---

[2]This is a case of first impression concerning the interpretation of section 5(j) of the OCSLA. Statutory interpretation presents a question of law that we review *de novo. Lohr v. Medtronics, Inc.,* 56 F.3d 1335, 1341 (11th Cir.1995). We also review an administrative agency's statutory interpretation *de novo,* but defer to an agency's interpretation if it is reasonable. *Id.*

*States,* 832 F.2d 935, 938 (5th Cir.1987). In this regard, the law governing oil and gas has been described as being more like that governing wildlife than the law governing solid minerals. *See* Dean Lueck, *The Rule of First Possession and the Design of the Law,* 38 J.L. & Econ. 393, 403 (1995).

The problem with the rule of capture is that it encourages a tract owner to build wells near his border so as to drain not only the reserves underlying his own tract, but also the reserves underlying a neighboring tract. *Id.* The neighboring tract owner, in order to protect his mineral rights, must then build offsetting wells—most advantageously right across the border from his neighbors' wells—and start production or risk losing his reserves. Each tract owner then has an incentive virtually to race to drain the reservoir as quickly as possible to capture as much oil or gas as he can. The result is (1) economic waste in drilling unnecessary wells; (2) a corresponding heightened risk of damage to the environment; and (3) physical waste of the oil or gas itself because the faster production occurs, the lower the long-term recovery will be from the reservoir. Because of its negative effects, nearly every state has abrogated the rule of capture legislatively with well-spacing rules, production regulations, and/or other conservation mechanisms. *See id.*

But the rule of capture still governs the outer continental shelf. *See State of Louisiana v. United States,* 832 F.2d 935, 938 (5th Cir.1987). *Within* the outer continental shelf, it is not as important to abrogate the rule of capture because reservoirs do not straddle different tracts of land as they would within a state:

the DOI controls the entire area; it has authority to create lease tracts that correspond to reservoirs; and it has authority to require lessees to combine drilling and production efforts. But all the problems of unrestrained application of the rule of capture are present along the federal/state boundary where about 150 known reservoirs, including the one at issue in this suit, lie partly under federal control and partly under state control.

Congress passed Section 5(j) as part of the Oil Pollution Act of 1990.[3] *See generally* J.B. Ruhl & Michael J. Jewell, "Oil

---

[3]In full, section 5(j) provides:

> (j) Cooperative development of common hydrocarbon-bearing areas
>
> (1) Findings.—
>
> (A) The Congress of the United States finds that the unrestrained competitive production of hydrocarbons from a common hydrocarbon-bearing geological area underlying the Federal and State boundary may result in a number of harmful national effects, including—
>
> (i) the drilling of unnecessary wells, the installation of unnecessary facilities and other imprudent operating practices that result in economic waste, environmental damage, and damage to life and property;
>
> (ii) the physical waste of hydrocarbons and an unnecessary reduction in the amounts of hydrocarbons that can be produced from certain hydrocarbon-bearing areas; and
>
> (iii) the loss of correlative rights which can result in the reduced value of national hydrocarbon resources and disorders in the leasing of Federal and State resources.
>
> (2) Prevention of harmful effects
>
> The Secretary shall prevent, through the cooperative development of an area, the harmful effects of unrestrained competitive production of hydrocarbons from a common hydrocarbon-bearing area underlying the Federal and State boundary.

Pollution Act of 1990:  Opening a New Era in Federal and Texas Regulation of Oil Spill Prevention Containment and Cleanup Liability," 32 S.Tex.L.Rev. 475 (1991).  Section 5(j) was the latest Congressional pronouncement in a long-standing dispute between states and the federal government over offshore oil and gas reserves.  *See State of Louisiana v. United States,* 832 F.2d 935, 941 (5th Cir.1987);  *State of Texas v. Secretary of Interior,* 580 F.Supp. 1197, 1122 (E.D.Tex.1984);  *see also* Roger J. Marzulla, *Federalism Implications and OCSLA Section 8(g),* 2 Nat. Resources & Env't 26 (1986);  Edward A. Fitzgerald,*The Seaweed Rebellion: The Battle Over Section 8(g) Revenues,* 8 J.Energy L. & Pol'y 253 (1988).

## II. Procedural Background

In its complaint, the State of Alabama alleged that it was unlawful, pursuant to section 5(j) of the OCSLA, 43 U.S.C. § 1334(j),[4] for the DOI to authorize Mobil to produce natural gas by wells located on Block 823 from the reservoir straddling the federal/Alabama boundary without first entering a formal cooperative development agreement with Alabama.  Alabama argued that Mobil would drain natural gas from the part of the reservoir within Alabama and that Alabama would lose the royalties corresponding to that drained natural gas.[5]  However, Alabama did not request that production be halted until a cooperative

---

[4]*See* 43 U.S.C. § 1349 (providing for citizen suits for "any person having a valid legal interest which is or may be adversely affected ... to compel compliance with [the OCSLA] );  the Administrative Procedure Act, 5 U.S.C. § 706.

[5]Alabama charges a royalty rate of 25%, while the federal government charges only 162/3%.

development agreement was entered.  Instead, Alabama requested an order requiring the DOI to place into an escrow account all royalties the federal government received from Mobil's natural gas production from Block 823 until the DOI and Alabama entered a cooperative development agreement addressing the drainage issue.

The DOI moved for summary judgment arguing that section 5(j) did not require the DOI to reach a formal cooperative development agreement with Alabama before the DOI could authorize the production of natural gas and that, even if section 5(j) required a formal cooperative development agreement, it did not require such an agreement to address drainage compensation.  The DOI argued that section 5(j) merely requires the DOI to make a good faith effort to reach an agreement with Alabama, and that it had done so by providing Alabama with all relevant information, considering Alabama's comments and concerns, and attempting in good faith to negotiate an agreement.  The DOI further asserted that, because no harmful effects are present in the reservoir at issue, i.e., because Alabama has not drilled wells necessary only to protect itself from drainage, there are as yet no harmful effects.

The district court found that the DOI's interpretation of section 5(j) was inconsistent with the language of section 5(j) and held that it was unlawful under section 5(j) for the DOI to authorize Mobil to begin natural gas production without first entering into a cooperative development agreement with Alabama. The court then ordered the DOI and Alabama to reach a cooperative development agreement and required the DOI to place all royalties paid by Mobil to the DOI for natural gas production from Block 823

into the court registry until an agreement was reached.[6]

Notwithstanding its decision to "hold" the royalties pending agreement, the district court disagreed with Alabama's assertion that section 5(j) required the DOI to address drainage compensation through the division of royalties. The court held, instead, that another provision of the OCSLA, Section 8(g) of the OCSLA, 43 U.S.C. § 1337(g), discussed *infra,* exclusively governed these issues.

Although we agree with the district court that section 5(j) does not affect the drainage compensation provisions found elsewhere in the OCSLA, we reverse the district court's determination that federal law requires the DOI to enter a formal cooperative development agreement before authorizing production.

*III. Whether section 5(j) required the DOI to address drainage compensation through the division of royalties.*

Alabama asserts that the district court erred in holding that compensation for drainage and division of royalties is governed exclusively by section 8(g) of the OCSLA, 43 U.S.C. § 1337(g), and, by implication, that such compensation need not be addressed in cooperative development under section 5(j). Alabama asserts that the cooperative development mandated by section 5(j) by definition addresses compensation for drainage, and that an agreement on the division of royalties is a tool the DOI should have available to it to negotiate a cooperative development agreement with Alabama. We find that Alabama reads too much into section 5(j) and that section 5(j) neither adds nor takes anything away from provisions contained

---

[6]Presently over $24 million is being held by the district court.

in section 8(g)(2) that govern drainage compensation through the division of royalties.

Prior to Congress's passage of section 5(j), section 8(g)(2) already directly addressed the issue of drainage compensation. It provided that the DOI must give the adjoining coastal state 27% of the royalties it receives from any federal lease in an area designated the "8(g) zone." This zone is the band of the outer continental shelf situated between three and six miles offshore; the state is to receive its 27% share of the royalties regardless of whether the federal lessee is draining oil or gas from state territory or not. Section 8(g)(2) provides that

> the Secretary shall transmit to [the adjoining] coastal State 27 percent of [the] revenues [derived from any lease of any Federal tract which lies within three nautical miles of the seaward boundary of any coastal State], together with all accrued interest thereon. The remaining balance of such revenues shall be transmitted simultaneously to the miscellaneous receipts account of the Treasury of the United States.

Section 8(g)(2) of the OCSLA, 43 U.S.C. § 1337(g)(2).

Section 8(g)(2) replaced an earlier provision that established a scheme whereby revenues obtained from a federal lease operating in the 8(g) zone would be shared in a "fair and equitable manner" by the federal government and the coastal state if a determination was made that a common field of oil or gas underlay federal and state territory so as to create a threat of drainage by the federal lessee. *See* 43 U.S.C. § 1337(g) (repealed 1986); *see also State of Louisiana v. United States,* 832 F.2d 935, 941-42 (5th Cir.1987). The earlier provision required an exchange of information between the governor and secretary, then negotiations, and then, if no agreement could be reached, determination by a district court of a

"fair and equitable disposition of the revenues." *See* 43 U.S.C. § 1337(g) (repealed 1986).

The district court that heard the first such case found this original scheme to be unworkable and, in its order, urged Congress to change the law. *See State of Texas v. Secretary of Interior,* 580 F.Supp. 1197, 1122 (E.D.Tex.1984). *But see* Fitzgerald, *The Seaweed Rebellion,* at 275-77 (arguing that the scheme would have been workable had the district court not misinterpreted key phrases in the statute). Congress responded by replacing section 8(g)(2) with the 27% compromise language presently found in section 8(g)(2). Congress made this change to section 8(g)(2) with the intent of permanently settling disputes over drainage compensation on the outer continental shelf. *See State of Louisiana v. United States,* 832 F.2d 935, 941-42 (5th Cir.1987) (quoting legislative history of the amendments to section 8(g) and concluding that section 8(g)(2) represented a compromise between state and federal interests).

In addition to the 27% state share of royalties provided for by section 8(g)(2), when Congress passed section 5(j), section 8(g)(3)[7] already provided that the secretary or the governor of a

_____

[7]Section 8(g)(3) provides that

> [w]henever the Secretary or the Governor of a coastal State determines that a common potentially hydrocarbon-bearing area may underlie the Federal and State boundary, the Secretary or the Governor shall notify the other party in writing of his determination and the Secretary shall provide to the Governor notice of the current and projected status of the tract or tracts containing the common potentially hydrocarbon-bearing area. If the Secretary has leased or intends to lease such tract or tracts, the Secretary and the Governor of the coastal State may enter into an

coastal state must notify the other if either determines that a reservoir may straddle the federal/state boundary, and that the secretary must provide the governor with notice of current and projected development in the area. Additionally, section 8(g)(3) provided that, if the secretary had leased an area, the secretary and the governor "may" enter into "a unitization or other royalty sharing agreement" to combine tracts and share the revenues from production. But if no agreement was reached, the secretary had the authority to proceed with the leasing of the area alone and give the state 27% of the revenue pursuant to subsection (g)(2).

In reading sections 8(g)(2) and 8(g)(3), it is reasonable to assume that Congress intended section 8(g)(2) to strike a compromise between coastal states and the federal government to resolve the drainage compensation issue by giving states 27% of the royalties derived from production in the 8(g) zone. Somewhat apart from the issue of drainage compensation, Congress intended section 8(g)(3) to provide the DOI with tools necessary to ensure good conservation practices on and efficient development of reservoirs straddling the border, such as the authority to negotiate and agree with states to combine lease tracts and divide the royalties by way of unitization or to agree to other royalty sharing agreements with

---

> agreement to divide the revenues from production of any common potentially hydrocarbon-bearing area, by unitization or other royalty sharing agreement, pursuant to existing law. If the Secretary and the Governor do not enter into an agreement, the Secretary may nevertheless proceed with the leasing of the tract or tracts. Any revenues received by the United States under such an agreement shall be subject to the requirements of paragraph (2).

Section 8(g)(3) of the OCSLA, 43 U.S.C. § 1337(g)(3).

states. Such other royalty sharing agreements under section 8(g)(3) might include reciprocal agreements to share with a state royalties the federal government has realized from federal production from a reservoir straddling the border in exchange for the state sharing with the federal government royalties the state has realized on a different reservoir straddling the border.

In light of sections 8(g)(2) and 8(g)(3), we find section 5(j) to be more akin to section 8(g)(3), than to section 8(g)(2) as Alabama asserts. We find unpersuasive Alabama's argument that, in enacting section 5(j), Congress intended to indirectly rekindle the drainage compensation issue it had four years earlier permanently settled by amending section 8(g)(2)—particularly where, as here, Congress did not explicitly mention drainage compensation in the text of section 5(j), but merely referred to cooperative development. Given the long dispute both in Congress and the courts between coastal states and the DOI over drainage compensation along the federal/state boundary, one would expect substantial legislative history and debate over section 5(j) had Congress intended to address this issue. Yet there are no committee reports, virtually no record of floor debates and little other legislative history regarding section 5(j). Accordingly, we hold that Congress did not intend to address drainage compensation in section 5(j).

We find further support for our holding by comparing the version of section 5(j) that Congress passed with the version that was first introduced. As originally offered in the Senate, section 5(j) required the Secretary to "prevent the harmful effects of

unrestrained competitive production of hydrocarbons from a common hydrocarbon-bearing area underlying the Federal and State boundary *by protecting against drainage* through the cooperative development of such area."  *See* 135 Cong.Rec. S8488-03, S8500-S8501 (1990) (emphasis added).  Section 5(j) further provided both the federal government and the affected coastal state with the authority to seek an injunction in district court "*in order to prevent the drainage of federal oil and gas resources* " until the parties could agree on a "*fair and equitable apportionment* of the oil and gas resources involved," or until the district court entered final judgment in favor of one party or the other.  *Id.*

Comparing the version of section 5(j) originally offered with that eventually passed, it is apparent that the breadth of section 5(j) was drastically reduced over the course of legislative debate and negotiation.  At passage, gone was any mention of drainage and all of the language that would have provided for the "fair and equitable apportionment of oil and gas resources" and injunctive relief.  Although section 5(j) may have been introduced with the intent of addressing the drainage compensation issue, it is significant that all the language related to drainage compensation had been eliminated by section 5(j)'s passage.  It is reasonable to assume that Congress would not have deleted this language had it intended section 5(j) to address this issue.  *Cf. Russello v. United States,* 464 U.S. 16, 23-24, 104 S.Ct. 296, 300-01, 78 L.Ed.2d 17 (1983) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.");  *see also*

*Southern Pacific Transportation Company v. Usery,* 539 F.2d 386, 391 (5th Cir.1976).

Alabama's interpretation of section 5(j) asks us to read back into section 5(j) provisions pertaining to drainage compensation that Congress—for whatever reason—specifically eliminated prior to passage. In light of the specific provisions addressing drainage compensation in section 8(g)(2) that remained in effect following the passage of section 5(j), we cannot accept Alabama's argument that we should construe section 5(j)'s broad "cooperative development" language as indirectly abrogating the 27% compromise struck in section 8(g)(2). For all of the foregoing reasons, we agree with the district court that drainage compensation is governed by section 8(g)(2), and is not altered by section 5(j).

*IV. Whether Section 5(j) requires a formal agreement in other respects.*

We turn now to the DOI's arguments that section 5(j)(2) does not require it to enter into a formal cooperative development agreement with Alabama. Section 5(j)(2) provides that

> *[t]he Secretary shall prevent, through the cooperative development of an area,* the harmful effects of unrestrained competitive production of hydrocarbons from a common hydrocarbon-bearing area underlying the Federal and State boundary.

43 U.S.C. § 1334(j) (emphasis added). We find that reading the plain language of section 5(j), it is clear that the word "prevent" means prevent before something occurs, particularly in the context of the cooperative development envisioned under this section. Moreover, we cannot agree with the DOI's interpretation that the word "prevent" can be reasonably read to apply to something after it has occurred. The DOI concedes that it interprets "cooperative

development" under section 5(j) as requiring it to (1) provide the adjoining state with all relevant information, (2) consider the state's comments and concerns, and (3) attempt in good faith to negotiate an agreement. It would make little sense to undertake such activities only after a finding is made that the state is likely to build offsetting wells. The "cooperative development" Congress mandated in section 5(j) itself would help to identify when the drilling of such wells is likely to occur. Put another way, the harmful effects Congress directed the DOI to prevent in section 5(j), i.e., the drilling of wells necessary only to prevent drainage and other measures that do not comport with conservation practices and that are connected with two sovereigns developing and producing natural gas from the same reservoir without cooperating with each other, are likely to occur *whenever* it is discovered that there is a reservoir straddling the federal/state boundary. The DOI may not wait until the state has already built an offsetting well or is about to begin building an offsetting well to engage in cooperative development. Therefore, "prevent" as the term is used in section 5(j) must be read in the context of long-term prevention.

The definition of "development" in the OCSLA provides further support for our reading. Development refers to activity after discovery of reserves, but *before production* of oil or gas, including drilling, construction of platforms, and operation of onshore support facilities. *See* 43 U.S.C. § 1331(*l* ). For these reasons, we hold that the DOI's interpretation of section 5(j) as requiring a showing that harmful effects have occurred or are

likely to occur before the DOI is under an obligation to undertake cooperative development is inconsistent with the language of section 5(j).

The DOI next argues that "cooperative development" under section 5(j)(2) does not require a formal agreement. We need not address the issue of whether the term "cooperative development" implies that an agreement must be reached, because, assuming *arguendo* that it does, we nevertheless find that section 5(j)(2)'s cooperative development language "is not susceptible to a literal reading because it is simply not possible to order two parties to enter into an agreement if they do not agree." *See Ponca Tribe of Oklahoma v. State of Oklahoma,* 37 F.3d 1422, 1435 (10th Cir.1994) (holding that language in the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.,* requiring a court to order a state and an Indian tribe to agree to a compact within 60 days is not subject to a literal reading); *see also Seminole Tribe of Florida v. State of Florida,* 11 F.3d 1016, 1020 (11th Cir.1994). Thus, although Congress could impose rules governing drainage compensation as it did in section 8(g)(2), *see* section 8(g) of the OCSLA, 43 U.S.C. § 1337(g) (requiring the DOI to transfer 27% of the royalties derived from production by federal lessees from reservoirs on the outer continental shelf within three miles of the state boundary to states), or could require that royalties obtained from a federal lease be shared in a "fair and equitable manner" by the federal government and the coastal state as determined by a district court, *see* 43 U.S.C. § 1337(g)(2) (repealed 1986); *see also State of Louisiana v. United States,* 832 F.2d 935, 939 (5th

Cir.1987); Edward A. Fitzgerald, *The Seaweed Rebellion: The Battle Over Section 8(g) Revenues,* 8 J.Energy L. & Pol'y 253 (1988), Congress lacks the power to force the DOI and a state to agree to a cooperative development agreement. *See Ponca Tribe,* 37 F.3d at 1435. It does have the power to require the DOI to attempt to reach an agreement in good faith. However, we are left with the question of what happens if the DOI and the affected state fail to reach a cooperative development agreement. *Cf.* Section 11(d)(7)(B) of the IGRA, 25 U.S.C. § 2710(d)(7)(B) (requiring a state and tribe to agree to a compact, but providing that, if they fail to agree to a compact, then the state and tribe must submit to a mediator and then, if an agreement still cannot be reached, the Secretary of the DOI decides the dispute).

Although section 5(j) as it was originally introduced authorized both the state and the federal government to file suit in district court and seek an injunction "or other appropriate remedy" when the parties failed to reach a cooperative development agreement, these provisions had been deleted by section 5(j)'s passage. *See* 135 Cong.Rec. S8488-03, S8500-S8501 (1990). Thus, when Congress deleted these provisions, it left a gap in section 5(j) regarding what happens if the parties cannot reach an agreement. In this case, the DOI informally filled this gap by proceeding unilaterally.

We agree with the DOI's action—that it may proceed unilaterally—*provided* the DOI first has negotiated in good faith to reach a cooperative development agreement with the affected coastal state. In this regard, we find section 5(j)(2) to be closely akin

to section 8(g)(3), which gives the DOI the authority to enter into "unitization or other royalty sharing agreement[s]" with states regarding reservoirs straddling the federal/state border. We read section 5(j)(2) as going one step further to *require* the DOI to negotiate in good faith with states to enter into one or more royalty sharing agreements regarding reservoirs straddling the federal/state border with the goal of promoting good conservation practices.

Were we to hold, as the district court did, that the DOI may not unilaterally authorize production without first reaching a cooperative development agreement with Alabama under section 5(j), we would be interpreting section 5(j) as requiring the DOI to negotiate until an agreement is reached, thereby allowing Alabama to refuse to agree until its demands are met. Such an interpretation would hardly place the parties on an equal footing for negotiating an agreement because the consequence of the DOI and Alabama failing to reach an agreement would be to delay federal production until an agreement was reached, but there would be no corresponding consequence for Alabama. State production would not be affected by such an interpretation of section 5(j). Section 5(j) only requires the *DOI* to reach a cooperative development agreement with states; it does not require the states to enter a cooperative development agreement with the DOI. Therefore, Alabama could always threaten to leave the negotiating table unless its demands are met, while the DOI would have to stay until an agreement is reached because, under the district court's interpretation, the DOI could only lawfully authorize production

under section 5(j) after it has entered a cooperative development agreement. This consequence would give Alabama effective veto power over the DOI's lawful authorization of natural gas and oil production; in other words, Alabama could hold the production of natural gas from federal territory "hostage" until the DOI had agreed to Alabama's terms. We find that Congress could not have intended section 5(j) to give coastal states such veto power over federal territory when the DOI and a state are unable to reach a cooperative development agreement.

Nonetheless, in negotiating to reach agreement, neither the DOI nor the state may rely on patently unreasonable conditions. States may legitimately assert noncompliance with section 5(j) by alleging that the DOI failed to negotiate in good faith. Likewise, the DOI can defend such an allegation or its unilateral authorization of production, by asserting that the state conditioned formal agreement on unreasonable demands.

Difficult cases may arise in which the parties, despite good faith negotiations by both sides, simply cannot reach an agreement. In such cases—when it cannot be said that either side is being unreasonable—in the absence of Congressional direction, we conclude that the DOI may proceed alone to authorize production on its lease tracts without violating section 5(j).

In this case, the DOI proposed a royalty sharing agreement that would share with Alabama the royalties it received from Mobil's production on federal Block 823 in exchange for Alabama sharing with the federal government the royalties derived from Alabama Lease Block 132 in the Fairways area, which is a second

natural gas reservoir straddling the federal/Alabama border located near the reservoir underlying Block 823. Federal Block 823 and Alabama Lease Block 132 thus each drew natural gas from two separate reservoirs straddling the federal/Alabama border. On Block 823, Mobil had the potential to drain natural gas from Alabama, while on Block 132, Alabama's lessee had the potential to drain natural gas from federal territory. Neither party had lessees drilling offset wells to prevent drainage.

The DOI's proposal would have compensated Alabama for any drainage occurring from wells on Block 823 and correspondingly would have compensated the federal government for any drainage occurring from wells on Block 132 without the need for either sovereign to build offset wells to protect itself from drainage. Alabama rejected this proposal, insisting on negotiating for a share of the royalties from Mobil's production on federal Block 823, while refusing to broaden the negotiations to include sharing of royalties from Alabama Block 132. Alabama's actions call into question its interest in promoting conservation and preventing harmful effects through section 5(j), as opposed to seeking financial gain. While we note that the DOI's responsibility to prevent harmful effects is a continuing one, we do not find, under the circumstances as they have developed to this point in this case, that the DOI has failed to negotiate in good faith.

For the foregoing reasons, we AFFIRM the district court's holding that section 5(j) does not affect the drainage compensation provisions found in section 8(g)(2) and we REVERSE the district court's holding that section 5(j) requires the DOI to enter a

formal cooperative development agreement before authorizing natural gas production from federal territory.

AFFIRMED in part, REVERSED in part and REMANDED for further disposition consistent with this opinion.